Chief Justice Watkins delivered the opinion of the Court. The appellant was indicted for murder. Upon trial in the court below, he was convicted of murder in the second degree,, and in accordance with the verdict of the jury, was sentenced to seven years confinement in the penitentiary. His motion for' new trial, was overruled, to which he excepted, setting out the? evidence adduced on the trial. The grounds of the motion were, that one of the jury, while-in charge of the officer, and deliberating upon , their verdict, absented himself from the jury room: that the verdict is contrary to law and evidence; and that the court refused to give instructions; asked for by the accused. These propositions embrace, in substance, the various grounds assigned in the motion. The first ground was sustained by the affidavit of one of the-jurors, that another juror, named, absented himself fro m the room,, provided for the jury at the hotel, without being in custody of’ the officer who had charge of the jury; that the officer, being notified of his absence, went in search of him, but came back without him; that the juror continued absent for about two hours, and did not return to the room until near day-light. To rebut this, the attorney for the State filed the affidavit of the juror, whose conduct had been thus impeached, to the effect, that during the night referred to, he was seriously indisposed, and suffering from a violent head-ache, and on account of the noise made in the jury room, he went out into the passage adjoining, in the third story of the hotel, for the purpose of obtaining relief, and for no other purpose. That he went out openly, and expecting, to return immediately, but finding a table in the passage, he laid down on it for relief, and remained there until he returned into the jury room, from whence he was absent about one hour, being all the-time within hearing and call of the officer. That during his absence, he did not see or converse with any person. It appears that the attorney for the State excepted to the opinion of the court in allowing the first affidavit to be filed on behalf of the prisoner; and certainly the mode here resorted to of impeaching the verdict by the affidavit of one of the jurors who concurred in rendering that verdict, is subject to many serious objections. But, apart from that, and waiving any inquiry whether the affidavit on its face is sufficient to raise a presumption that the absent juror was exposed to improper influences, any such presumption is fully rebutted, and the absence explained by the affidavit of the juror himself. There is nothing in this objection, as held in Cornelius v. The State, 7 Eng. 810. As to the second ground, that the verdict is against law and evidence, it need only be said, that the record discloses abundant evidence to sustain the verdict. Although there is some conflict of testimony; and, according to the imperfect idea we can form, from the bill of exceptions, of the weight of evidence, we may conclude that the jury .might, or ought to have found differently, yet this case comes within the rule in Bevens v. The State, 6 Eng. 463, where the accused was convicted of murder in the first degree, that this court will not award a new trial, notwithstanding the contradictory statements of the witnesses, if there is nevertheless enough testimony to support the verdict, so that it can not be said to be without evidence in any essential ingredient of the finding. The guilt of the prisoner was made up of fact and criminal intention, of which the jury are the proper judges, and, as said by this court in the case1 referred to : “We cannot fail to remember that the court below and jury had the advantage of receiving the evidence from the mouths of the witnesses, and had the opportunity to observe their manner, tone and countenance; and, therefore, from being thus in more favorable circumstances to estimate the different parts of the testimony, could more accurately weigh it than we can.” So it was the duty, of the judge presiding, at the trial, and his peculiar province, to have set aside the verdict, if, in his opinion, it was clearly against the weight of evidence; but having expressed himself satisfied with it, this court ought not, for that cause alone, to disturb it, unless it appears to be unsupported by evidence. The ends of public justice require that the rule on this subject should be the same in civil as in criminal cases. The remaining ground assigned, presents a question of more serious difficulty, and becomes necessary to look into the testimony, to enable us to determine whether the jury may have been induced to give a wrong verdict by the alleged error of the court in refusing to give the instructions asked for by the accused. The facts of the case appear to be that, on the 13th November,. 1849, the steam-boat St. Francis was lying at the wharf at Little Rock, bound up the river. About 9 o’clock in the forenoon, the accused, who lived in the Choctaw Nation, came on board as a deck passenger, and stowed his baggage in the after part of the boat. From that time, until between one and two o’clock, when the killing took place, the accused, who had been drinking, seemed disposed to make himself troublesome, by loud talking, assuming authority on the boat, and ordering the deck hands about. Wiley, the deceased, was one of the hands on the boat, to whom the accused more particularly addressed himself. He repeatedly came to where Wiley was engaged in his duties about the boat,, to renew the quarrel with him, and Wiley as often told him to go off and mind his business, and let him alone, that he wanted to have nothing to do with him. Wiley was a younger and stouter man than Stanton. Up to this time, he did not seem to be angry, but spoke good humoredly, and said if Stanton came about him any more he would throw him in the river, on the side next the shore, so as not to drown him. The accused did go to him again, and Wiley threatened to slap him over. He repeated the words “enough said,” two or three times, and went aft, and got a pistol out of his trunk. He then returned to where Wiley was, in the engine room, and advanced towards Wiley: as he did so, Wiley slapped him, and Stanton then drew his pistol. Wiley then seized a stick, or broom handle, and struck a severe blow at Stanton, but the blow was caught by the hog-chain, or a stanchion, behind which Stanton had dodged. The noise attracted the mate of the boat, who came up about this time, and ordered Stanton to go ashore. Stanton could have shot Wiley, but he seemed alarmed and cowardly. He put up his pistol, and went ashore, the mate following him about half way down the plank. After getting ashore, he went up the bank a few steps and turned, facing the boat and the mate. Atthe same instant, Wiley walked rapidly off the boat, passing the mate, who stood on the gangway, and turning towards Stanton, went directly up to him. As Wiley got on shore, he stooped as if to pick up something, but did not do so. Stanton had again drawn his pistol, and stood holding it before him, so that Wiley must have seen it. As Wiley came up, Stanton advanced a step, and Wiley reached out to catch the pistol, and seized Stanton by the breast. Simultaneously with this motion, on the part of Wiley, Stanton fired, the pistol taking efiect in the left breast of Wiley, causing immediate death. The intention of Wiley appears to have been to push Stanton into the river. Although mortally wounded, he pushed him two or three steps backward to the bank, and he fell into the water, and he then picked up the pistol, which Stanton had dropped, and made a motion to throw it at him in the river; but, in the act of doing so, staggered and fell dead. While in the water, Stanton halloed “stop him, or he will kill me.” Wiley had no weapons, and used none. There was no previous quarrel or grudge between, the parties.. The court charged the jury, in the words of the statute, as to the definition of murder, the distinction between murder in the first and second degree, and the punishment affixed to each. The definition of manslaughter, and the punishment affixed to voluntary and involuntary manslaughter. The definition, if justifiable homicide, and excusable homicide by misadventure. The portions- of the charge more immediately bearing upon this inquiry, are as follows:. “That manslaughter is the unlawful killing of a human being, without malice, expressed or implied, and without deliberation. Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation apparently suffi-eient to make tbe passion irresistable.” The killing of a human being, in the heat of passion, by or with a dangerous weapon, in any case except wherein the killing is herein declared to be excusable or justifiable, shall be adjudged manslaughter.” That “justifiable homicide is the killing of a human being in necessary self-defence, or in defence of habitation, person or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony. A bare fear of those offen-ces to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing: it must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under their influence, and not in a spirit of revenge. That in ordinary cases of one person killing another, in self-defence, it must appear that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary; and it must appear also that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further contest, before the mortal blow or injury was given.” The defendant, by his counsel, then moved the court to instruct the jury “That under our law, and the foregoing statutes, the same distinction existed between murder and manslaughter, and killing in chance medley, as obtained at common law; and that in this case, if they should find this to be a case held to be chance medley at common law, the defendant should be acquitted; and that the fact that some blame attaching to the party killing, in this species of offence, could not change the result. That the statute read to the jury, rendered all cases of justifiable and excusable homicide, justifiable or excusable, as the case might be, which were so at common law; and that at common law, as well as under our statutes, in cases of excusable homicide, in contemplation of law, as well as of fact, some fault was always deemed to rest on the party killing.” The court refused to give this instruction, but further charged the jury, “that if they had a reasonable doubt in regard to any material fact, necessary to con-etitute any offence, the prisoner is entitled to the benefit of that doubt, and if they doubted whether the offence was of a lower or higher grade, they were to give the prisoner the benefit of that doubt, and find the lower offence; and so if they doubted that any offence existed, that doubt should induce them to acquit.” Upon a fair statement of this case, it is difficult to perceive how the prisoner was injured by the refusal of the court to charge the jury, as was requested on his behalf. We do not consider that we are required to discuss any question, as to whether our statute, which undertakes to codify the criminal law, is an abrogation or change of the common law; and, if so, what extent. If the statute makes any change, it must prevail, though to be construed by parity of reason with anologOus cases at the common law. If no change, is made, it would seem that the whole ground of the instruction asked for by the accused, is covered by the charge which the court gave. In such case, the court is not bound, on the motion of either party, to repeat the same charge in substance, though varied in terms, and its refusal to do so, cannot be intended to work any injury to the party asking the repetition — on the contrary, it would only be calculated to confuse the jury. As the party who moves an instruction has the right to have it distinctly given or refused, in the language he puts it, so he should be bound by his election of the terms used, and, if an entire instruction asked for, be good in part, and objectionable in part, it is not the duty of the court to separate the instruction, and it will not be error, if the entire instruction be overruled. The instructions asked for, even if good in point of law, are objectionable, as being mere abstract propositions, not being made to apply to any state of facts proven, or supposed to be proved by the testimony. Because, the jury must pass upon the intention, with which an act is done, in order to determine whether it is criminal or not, and so are necessarily judges of law and fact, it does not follow that they are presumed to know the law, or may declare what the law is. If the design of the instruction asked for was to have the jury reduce the offence charged to manslaughter, or make it excusable homicide, in self-defence, the common law definition of those terms, and their application to the supposed facts, should have been stated. If the common law definition of killing in chance medley, obsolete under our statute, which classes all kinds of excusable homicide in self-de-fence, under the head of justifiable homicide,had been explained to the jury, it would not have been so favorable for the prisoner as the explanation given in the charge of the court. The authorities cited for the appellant, are well enough, if the case were being argued on the trial, in order to show that under the testimony the jury should bring in a verdict for manslaughter, or for justifiable homicide, but they do not meet the difficulty as to the alleged misdirection of the court. The jury, in considering the testimony, were doubtless influenced by-the fatal circumstance that the prisoner took occassion to arm himself with a deadly weapon, before he renewed the quarrel of his own seeking. Although the act of killing was apparently in self-defence, the jury may have believed that the prisoner armed himself for the purpose of provoking an impulsive adversary who was unarmed, to attack him in resentment for insulting words or gestures, and being thus attacked to slay his adversary under the pretence of acting in self-defence, or under the cover of retreat from the combat. If the jury thought, from the whole testimony, that such was the prisoner’s intention, the killing would have to be regarded as among the basest and most detestable species of murder, and the verdict being for murder in the second degree only,'was a compromise of justice in mercy to the prisoner. In the opinion of the court, the judgment ought to be affirmed.